UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 07-450 (ADM/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Michele Rae McBurney, | |
| Defendant. | |

Ann M. Anaya, Assistant United States Attorney, for the Government.
Kevin W. DeVore, Esq., for Defendant.

**THIS MATTER** came before the undersigned United States Magistrate Judge on February 6, 2008, on Defendant's Motion to Suppress Admissions or Confessions[1] [#38], Defendant's Motion to Suppress [#43], and Defendant's Motion to Dismiss [#44]. At the hearing, the Court received testimony from Drug Enforcement Agency ("DEA") Special Agent Warren Adamson ("Agent Adamson"), Minnesota State Trooper Jay Swanson (Trooper Swanson), and Minnesota State Trooper Scott Schneider. The Government submitted two exhibits at the hearing.[2] The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Defendant's Motions [#38, 43, 44] be denied.

---

[1] At the hearing, the Defendant advanced no arguments for suppression of statements; nor has any evidence of any statements or admissions been brought before the Court. Therefore the Court recommends denying this motion.

[2] Gov't Ex. 1 is a CD of a recorded conversation with Special Agent Adamson as undercover.
Gov't Ex. 2 is a DVD of the traffic stop conducted in this case.

## I.  FINDINGS OF FACT

**1. Testimony of Agent Adamson.**

Agent Adamson has been working for the Minneapolis office of the DEA for two and a half years. He investigates drug crimes and has served as an undercover officer approximately five times. Prior to starting with the DEA, he received sixteen weeks of basic training and he currently participates in ongoing training.

On or about November 10, 2007, Agent Adamson received information from a cooperating defendant that Defendant McBurney was going to pick up 200 pounds of marijuana in Chicago, Illinois. The cooperating defendant also told him that McBurney was renting a van due to the large size of the boxes containing the marijuana. Before McBurney left on her trip, the cooperating defendant told her that one of his friends would meet her and give her $200 for trip expenses. On November 13, 2007, around 1:15 p.m., Agent Adamson, posing undercover as the cooperating defendant's friend, met with McBurney in Minneapolis and gave her $200 for gas and spending money. (*See* Gov't Ex. 1.) Agent Adamson testified that, at this meeting, he did not use force, he did not make any threats and did not make any false promises to McBurney. When they met, Agent Adamson got into the van with McBurney and handed over the $200. Agent Adamson did not place McBurney under arrest at that time.

Agent Adamson testified that he and other DEA agents began conducting surveillance on McBurney around 10:00 a.m. on November 13, 2007. DEA agents watched while McBurney was picked up at a Best Western by an Enterprise Car Rental shuttle. The agents followed McBurney to the Enterprise Car Rental location where she rented a maroon van. They observed Enterprise employees remove the rear seats from the van. After the seats were removed, McBurney drove the

van to the location where she met Agent Adamson to pick up the $200.

Agent Adamson testified that he and his fellow agents received permission from a court to put a tracking device on the rental van. They put the device under the car behind the front passenger door before McBurney left the Twin Cities. Approximately eight agents were responsible for the surveillance in Minnesota, including Agent Adamson. After the meeting, McBurney began driving east on I-94 toward Wisconsin. The car stopped at a Taco Bell in the Wisconsin Dells area. At 4:14 p.m., McBurney stopped at a gas station and then continued on to the Chicago suburbs. Agent Adamson testified that once McBurney entered the Chicago area, DEA agents from the Chicago office continued the surveillance. At around 10:30 p.m., McBurney checked into a Motel 6 in Arlington Heights, IL. The tracking data showed that at 5:00 a.m. on November 14, 2007, she drove to the O'Hare airport and returned to the hotel at 6:00 a.m. At noon, she and a white male, later identified as Anthony Silva, traveled to a restaurant and visited downtown Chicago.

Agent Adamson testified that for the night of November 14, 2007, McBurney and Silva stayed at the Jamison Suites in Arlington Heights. At some point during the day, McBurney and Silva drove the van to Tinley Park and stopped at a Holiday Inn around 4:00 p.m. At the Holiday Inn, the Chicago DEA agents observed an unknown driver get into the van while McBurney and Silva waited at the Holiday Inn. The Chicago DEA agents followed while the unknown driver drove the van to a warehouse in a nearby industrial area, loaded six boxes into the back of the van, and drove it back to the Holiday Inn. While this transpired, Agent Adamson was in the area listening to the surveillance in real time on a radio. Agent Adamson testified that, in his training and experience, he has learned that it is common for drug traffickers to conceal from a drug courier the location where drugs are stored.

At 4:20 p.m., the unidentified driver turned the van over McBurney and Silva at the Holiday Inn and they began driving in a northwest direction toward Minnesota. In the evening, McBurney and Silva stopped at a hotel in Eau Claire, Wisconsin, for the night. While the car was parked at the hotel, Agent Adamson's partner, Trooper Flanagan, confirmed that the boxes were still in the van by looking in the van's window.

Agent Adamson testified that on the morning of November 16, 2007, he and other law enforcement officials determined they would stop the van in Minnesota with the assistance Minnesota State Troopers. Around 10:00 a.m., Agent Adamson coordinated with Trooper Schneider by cell phone about pulling the van over. Agent Adamson told Trooper Schneider that he would prefer that Schneider observe a traffic violation to justify the stop rather than stop the car on the basis of a drug trafficking violation in order to protect the identification and safety of the cooperating defendant.

Around 11:00 a.m., the van crossed the border into Minnesota. At this time, Agent Adamson was following the van about a half of a mile behind it. As he followed, Agent Adamson was on his cell phone with Trooper Schneider, giving him updates on the van's location. Agent Adamson exited the highway before the Defendant was pulled over so that he could observe the traffic stop from a distance. He stated that he did not observe the traffic violation which caused the Defendant to be pulled over and did not know how fast the Defendant's vehicle was traveling before it was pulled over. Agent Adamson testified that he did not take part in the traffic stop, did not arrest the Defendant, did not search the car, and did not read the Defendant her *Miranda* rights. Agent Adamson did, however, know that the Defendant chose not to give a statement. Agent Adamson testified that he did not actually see what was in the boxes.

**2. Testimony of Trooper Swanson.**

Trooper Swanson has been a Minnesota State Trooper for 28 years and currently holds the rank of captain. He is the commander of the state patrol's investigative services. Trooper Swanson spoke with Trooper Flanagan and Agent Adamson a few days before November 16, 2007, about McBurney who was believed to be transporting 200 pounds of marijuana from Chicago to the Twin Cities. He testified that they asked him to observe a traffic violation. Trooper Swanson assisted Trooper Schneider in making the stop. In his unmarked squad car, Trooper Swanson parked in the center median of I-94 about one half of a mile east of Manning Avenue in Washington County. Trooper Schneider, who was following the van, was advising him as to the van's location. Using his laser gun, Trooper Swanson clocked the van going 67 miles per hour in a 65 mile per hour zone. He also observed that the van was less than two car lengths behind the car in front of it. He relayed this information to Trooper Schneider who then activated his lights and pulled over the van.

Trooper Swanson then turned his car around and drove to where Trooper Schneider had pulled over the van. When Trooper Swanson exited his squad, Trooper Schneider was conversing with the driver - Anthony Silva - behind the van and was in the process of issuing warnings. Trooper Swanson heard Silva say at one point that he was on vacation and later heard him say that he was moving, two comments which, taken together, struck Swanson as odd. Trooper Schneider asked Silva for consent to search the car and he assented. Trooper Schneider also asked McBurney for permission to search the car but Trooper Swanson did not hear this conversation; he simply observed McBurney exit the van and walk to its rear. At that point, Trooper Schneider circled the van with his canine. When the dog reached the passenger door, it jumped excitedly.

Trooper Swanson testified that the laser gun he used to clock the van's speed creates no

record of the speed clocked other than temporarily displaying it. He stated that when he clocked the van's speed, the level of traffic was moderately heavy which was typical for the time and day of the week. Trooper Swanson testified that if he had not observed a traffic violation by the van, he or Trooper Schneider still would have stopped the van; however, his preference was to make the stop based on a traffic violation to protect the identity of the cooperating defendant.

### 3. Testimony of Trooper Schneider.

Trooper Schneider has been employed as a Minnesota State Trooper for five years. For the last three and a half years he has been a K-9 dog handler. His dog is eight years old and has been successful. His dog is an aggressive indicator dog which means that it reacts energetically to the presence of marijuana, among other controlled substances. Trooper Schneider testified that he was contacted by Trooper Flanagan a few days before November 16 and was told that an individual was believed to be transporting 200 pounds of marijuana to the Twin Cities in a maroon van. Trooper Flanagan told him that he had observed six boxes in the back of the van when the van was parked at the hotel in Eau Claire. Schneider was told to conduct a traffic stop rather than pull the car over for drug-related violations in order to ensure the safety of all those involved in the investigation. (*See* Ex. 2 for DVD of traffic stop.)

Trooper Schneider testified that on the morning of November 16, he began following the van soon after it crossed the state border into Minnesota. After Trooper Swanson radioed to him that the vehicle was traveling 67 miles per hour, Trooper Schneider activated his lights to pull over the van. When Trooper Schneider activated his lights, the video in his squad car began recording the stop. After he pulled the van over, Trooper Schneider approached the car from the passenger side and asked the passengers for their licenses and the car rental agreement. He discussed with Silva

6

and McBurney the fact that the rental agreement had expired and that McBurney - who was not driving - was the only person allowed to drive the van under the agreement. McBurney and Silva claimed to have called Enterprise and gotten an extension of the rental agreement. While they were talking, Schneider observed a number of large boxes in the back of the van.

At that point, he asked Silva to get out of the car. Trooper Schneider testified that it was standard procedure to separate passengers in an interdiction search. About six to seven minutes into the stop, Trooper Schneider asked Silva for consent to search the vehicle and he complied. He also asked McBurney for consent and she also agreed. He testified that he did not make any threats or promises when he asked them for consent to search. At that point, he also asked McBurney to step out of the car. Trooper Schneider and his dog then performed an exterior search of the car. The dog jumped multiple times in front of the passenger door. Trooper Schneider testified that the dog's activity meant that it was alerting to the presence of a controlled substance it was trained to detect. After discovering the marijuana, the Trooper placed the Defendant and Mr. Silva under arrest. He testified that after he and Trooper Swanson discovered the marijuana, they arrested McBurney and Silva.

## II.  CONCLUSIONS OF LAW

**The Troopers had probable cause to stop the van and therefore Defendant's Motion to Suppress [#43] and Motion to Dismiss [#44] must be denied.**

The Defendant alleges that the troopers' search of the van violated her Fourth Amendment rights because the officers did not have probable cause to stop the van. She contends therefore that the marijuana seized should be suppressed or the entire indictment should be dismissed. A law enforcement officer has probable cause to conduct a search or make an arrest where he has detailed information from a confidential informant that is independently corroborated by law enforcement

investigation.  *Draper v. U.S.*, 358 U.S. 307, 314 (1959); *Illinois v. Gates*, 462 U.S. 213 (1983).

In *Draper*, a confidential informant gave a law enforcement officer information that the defendant Draper had recently moved to Denver and was selling narcotics to several individuals in the city.  *Draper*, 358 U.S. at 310.  A few days later, the informant told the officer that Draper had gone to Chicago by train to purchase heroin and would return on either the morning of September 8th or 9th by train.  *Id*.  The informant also gave a detailed physical description of Draper and of the clothing he was wearing.  *Id*.  He stated he was wearing a light colored rain coat, brown slacks and brown shoes and that we would be carrying "a tan zipper bag" and that he often "walked real fast."  *Id*.

On the morning of September 9, law enforcement officers observed a person descend from the train arriving from Chicago with the exact physical attributes described by the informant, wearing the exact clothing described, carrying a tan zipper bag and walking fast toward the exit.  *Id*. at 310-11.  The officers arrested him, searched his person, and found two envelopes containing heroin and a syringe.  *Id*. at 311. The Court held that the officer making the arrest had "probable cause and reasonable grounds" to believe that petitioner was violating the law at the time Draper was arrested.  *Id*. at 314.  The subsequent search and seizure were therefore incident to a lawful arrest. *Id*.

Similarly, in *Gates*, an anonymous informant wrote law enforcement officers a letter describing in great detail the criminal activities of the defendants.  462 U.S. at 213.  The letter stated that the defendants, a husband and wife, were selling drugs and the wife planned to drive their car to Florida on May 3, and fly back to Illinois.  *Id*.  It stated that the husband had plans to fly down to Florida a few days later, to load the trunk of the car with drugs, and to return to Illinois.  *Id*.  The

letter also stated that the defendants had over $100,000 worth of drugs in their basement. *Id*. Acting on this tip, an officer learned the names of the defendants and that the husband had a reservation to fly to Florida on May 5.

Surveillance of the husband revealed that he indeed flew to Florida, stayed overnight at a hotel registered in his wife's name, and left the next morning with a woman in a car with an Illinois license plate issued to the husband. *Id*. The car headed north on a highway frequently used by individuals traveling to Bloomingdale, Illinois. *Id*. Based on these facts, law enforcement officers obtained a search warrant for defendants' automobile and home. *Id*.

The Defendants alleged that the letter and the affidavit were inadequate to sustain a determination of probable cause for the issuance of a search warrant. *Id*. The Supreme Court disagreed. Citing to *Draper*, the Court found that the informant's tips were corroborated by independent facts learned by law enforcement. *Id*. at 243-44. Namely, the investigator independently corroborated that the husband was flying to Florida, that the car was in Florida and that the husband drove the car back to Illinois. *Id*. at 244. The Court therefore concluded that the letter and the investigator's affidavit could be relied upon to establish probable cause. *Id*. at 246.

In this case, the cooperating defendant told Agent Adamson that McBurney was going to rent a van to drive to Chicago to pick up 200 pounds of marijuana. The cooperating defendant and Agent Adamson arranged for Adamson, posing as a friend of the cooperating defendant, to meet McBurney and give her $200 for gas and food. After receiving the information from the cooperating defendant, Agent Adamson and other law enforcement officers observed the Defendant rent a van from Enterprise Car Rental, meet Agent Adamson to retrieve the $200, and drive to Chicago. DEA agents observed while McBurney waited at a Holiday Inn in Tinley Park, IL while an unknown individual

drove the van to an industrial area and loaded it with six large boxes and returned it to McBurney. Agent Adamson testified that, in his training and experience, drug suppliers will frequently keep the location of where drugs are stored from individuals serving as drug couriers. DEA agents observed McBurney drive the van back to Minnesota with Anthony Silva.

As in *Draper* and *Gates*, in this case law enforcement officers independently corroborated the informant's information. As in *Draper*, the state troopers had probable cause to arrest McBurney. Therefore, the search of the vehicle (assuming, for a moment, that the consent given by McBurney and Silva to search the vehicle, was invalid) was incident to a lawful arrest. *See New York v. Belton*, 453 U.S. 454, 460 (1981) (holding that if the officer has made a lawful arrest of the occupants of an automobile, the officer may search the passenger compartment of the vehicle as a contemporaneous search incident to that arrest); *United States v. Snook*, 88 F.3d 605, 607-08 (8th Cir. 1996) (same); *U.S. v. Caldwell*, 97 F.3d 1063, 1067 (8th Cir. 1996) (holding that the rear storage area of a vehicle without a trunk is still part of the passenger compartment).

### III. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's motions [#38, 43, and 44] be **DENIED**.


DATED: February 15, 2008                              s/ *Franklin L. Noel*
                                                      FRANKLIN L. NOEL
                                                      United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 5, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **March 5, 2008,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.